JESSIE CATTERALL, ADMINISTRATRIX AD PROSEQUEN-
DUM, PLAINTIFF, v. OTIS ELEVATOR COMPANY, DE-
FENDANT.

Decided June 10, 1926.

**Negligence—Death of Workman Employed on an Elevator Shaft
—Workman was Employe of Subcontractor—Engaged in In-
stalling Elevator Doors—Defendant, a Subcontractor En-
gaged in Installing Elevators—Defendant in Charge of the
Elevators Which Could Not be Moved Except Upon Order
of Their Foreman—Elevator was Moved, Resulting in Em-
ploye's Death—It was for the Jury to Say Whether De-
fendant's Foreman Knew or Might Have Known That the
Shaft was to be Used on That Day, and if so, Whether De-
fendant Company Used Reasonable Care Commensurate
With the Danger—Held, That Plaintiff's Verdict was Not
Against Weight of Evidence nor Contrary to Charge of the
Court.**

On defendant's rule to show cause.

Before GUMMERE, CHIEF JUSTICE, and Justices KALISCH
and CAMPBELL.

For the rule, *Walter L. Glenney* (*Edwin F. Smith,* of
counsel).

*Contra, J. Raymond Tiffany.*

PER CURIAM.

A verdict was rendered in the Hudson Circuit in favor of
the plaintiff and against the defendant for $22,500. Defend-
ant was allowed a rule to show cause why the verdict should
not be set aside and a new trial granted.

Of the four reasons assigned for a new trial under the
rule to show cause only two of them are relied on and argued
in the brief of defendant's counsel. 1. That the verdict of
the jury was contrary to the weight of the evidence. 2. That
the verdict of the jury was contrary to the charge of the court.

The plaintiff brought her action under the Death act against the defendant company to recover the pecuniary loss sustained by her, in the death of her husband, alleged to have been caused by the negligence of the defendant company's servants. The facts are these: In June, 1923, Macy & Company was causing to be erected a new addition of many floors to its store at Thirty-fourth street, in the city of New York. The general contractor was Eidlitz & Company. There were several subcontractors, among whom was the Otis Elevator Company, the defendant.

The latter had charge of installing the elevators and escalators in the building. Norman Seaton & Company, another subcontractor, had charge of the installation of doors and tracks leading into the elevator shafts at the several floors of the building. At the time of the accident, in which the plaintiff's decedent lost his life, there was a battery of seven elevators designated as numbers 21 to 27, inclusive, in the course of construction. The deceased was in the employ of the Norman Seaton Company, and one of the duties of his employment was to hang elevator doors and to do track work in the various shafts in the above-mentioned seven elevators, all of which were under the control of the defendant company. The only shaft in temporary operation at the time of the happening of the accident was number twenty-two, the elevator having an operator in the employ of the defendant to run it. No work was permitted to be done in any of the elevator shafts without first having obtained permission from the defendant company. The practice was for the foreman to apply for permission to the general superintendent or his representative of the general contractor, who in turn would obtain permission of the representative of the defendant company. Its representative was James Coward. There is testimony to the effect that such permission was given. The character of the work to be done was of such a nature as to expose the employe to great hazard of life and limb, unless the person in control of the elevator shafts had notice that work was contemplated to be done in such shafts.

This was clearly so where the car was kept stationary on an upper floor and the work was done in the shaft on one of the lower floors. There were three switches which controlled the operation of the car in shaft twenty-one where the accident happened. The baby switch which was contained in the car itself operated by the person running it. A control switch in the "Pent House" on the roof level, and an emergency switch in the pit. It was not disputed that if the switches in the "Pent House" and in the pit were properly set the car in shaft No. 21, with which the mischief was done, could not have been stirred. This circumstance is an important feature in the case, since it was clearly established by the testimony that these switches were under the control of the defendant company.

Now, there was testimony of the foreman of the Norman Seaton & Company, under whose orders the decedent was working, on the day of the accident, that he, the foreman, was instructed to see to it that shaft No. 21 was clear for his men to go to work, and that he complied with the instructions, both in the morning before eight o'clock and in the afternoon at twelve-thirty. There was also proof that the elevator in shaft No. 21 had been used for several days before the accident to hoist materials, but when this was done notice was given to the workmen. The witness Augusteen testified that he worked with the deceased and that they were directed by the foreman to do work in shaft 21; that he had worked within fifteen feet of the shaft and that it had not been running all day; that the witness and deceased had received orders from the foreman to go into the shaft at about three o'clock in the afternoon; that before erecting a scaffold therein for the purpose of doing the work required both he and the deceased looked up the shaft and saw the elevator at the ninth or eleventh floor; that the work to be done by them in the shaft was on the fifth floor; that he went to the ninth or eleventh floor and placed a sign on the gate in front of the elevator 21, which sign consisted of a board eighteen inches long by six to eight inches wide and

on it he wrote with blue crayon "working below" in letters of an inch or an inch and a half in size.

Mr. Coward, who was the representative of the defendant company, testified that he was in charge of its elevators; that he was in charge of the operation of them and who would operate them; that elevator 21 was not turned over to Marc Eidlitz & Company, the general contractor. He was asked: "Was elevator 21 under your * * * when I say your I mean the Otis Elevator Company's * * * absolute control on June 4th, 1923?" "A. Yes, sir." "Q. Did you take any precaution to so control that elevator or so leave it that when your men were not working in it no other person could go upon it and use it?" "A. No, sir."

The situation in the shaft at the time the deceased and his companion started to construct the scaffold was that the elevator in shaft No. 21 was at rest several floors above the fifth floor on which they were preparing to work. The loops of the cable extended below the fifth floor. The scaffold consisted of two planks and were two by twelve. It was while standing on these planks, at work, when the accident happened. As has been already observed a notice was placed on the gate leading to the elevator, on the upper floor, containing the warning "working below."

According to the testimony of the witness, Augusteen, he and the deceased had been working in the shaft about thirty minutes when they both perceived the loops of the cable moving upwards, and almost momentarily there came a crash, a loop of the cable catching one end of the planks and tilted them, thereby causing the deceased to be precipitated to the bottom of the shaft and to his death. The witness saved himself by catching hold of the hood on the fifth floor into which he swung himself. Mr. Coward, the representative of the defendant, testified that he rode down on the elevator from the twelfth floor to the third, where he got out, and that one Sampson operated the elevator, who, though he had been an employe of the defendant company, he was not such at the time, but was an employe of the Eidlitz company; that the

witness told Sampson he had no right to run the elevator, and the witness gave as his reason for saying so that the elevators had not been turned over to the Eidlitz company. Whether Sampson was in the employ of the Eidlitz company or in the employ of the defendant company, under the evidence in the cause, was a factual question. We think there was proof of circumstances which tended to establish that whoever operated elevator 21, at or before the accident, could only properly have done so by permission of the defendant company's representative, Mr. Coward. Coward expressly states that elevator 21 had not been turned over to the Eidlitz company, and therefore no one was authorized to run it without his permission. According to his testimony, he himself used it shortly before the happening of the accident. Sampson operated it for him.

As elevator 21 was in the possession of the defendant company and under its control and management, by its representative, Mr. Coward, the jury was warranted to infer that he consented that Sampson should operate the car. There was no proof that anyone else was carried on that car, on that day, other than Mr. Coward. It is further to be observed that according to Coward's testimony it was three o'clock in the afternoon when he made the trip. He left the car when it reached the third floor. The accident happened at three-thirty. The car was seen by the men who went to work in the shaft a few minutes after three o'clock, standing motionless, at the ninth floor. As a matter of precaution Augusteen went up to the ninth floor and placed the sign of warning on the gate in front of the elevator. Sampson was not a witness. There was also proof that if the defendant company was not using the shaft, the employes of the other subcontractors would have men working there; that men were working on the shaft all the time. That Mr. Coward was aware of the situation which existed in shaft 21 cannot be successfully controverted. He made no pretence that the defendant company had the use of the shaft on that day, for if it had the other workmen occupied about the shaft

could not have used it. If the defendant company was using the shaft on that day the single instance of its use in evidence is the carrying of Mr. Coward from one of the upper floors to the third floor. Moreover, according to the testimony, elevator No. 22 was running and in charge of an employe of the Eidlitz company. It was for the jury to say whether, under the testimony and circumstances in the case, Mr. Coward knew, or might have known, that the shaft 21 was to be used by the Seaton workmen on June 4th, 1923, and of the peril threatening the laborers working in the shaft unless the shaft was kept free from the movement of the elevator, and if so, whether the defendant company exercised that degree of reasonable care commensurate with the degree of danger to be reasonably anticipated from leaving the elevator in a condition to be used or operated while the workmen were at work in the shaft. The elevator being under the exclusive control of the defendant company, the law cast upon it a duty to use reasonable care to guard against the elevator being operated or used while the workmen were in the shaft.

A fair reading of the testimony leads us to the conclusion that the verdict of the jury was not against the weight of the evidence nor contrary to the charge of the court.

The rule to show cause is discharged, with costs.